In re Maytor H. McKINLEY, Jr., Debtor.

**WILMINGTON SAVINGS FUND SOCIETY, FSB, Plaintiff,**

v.

Maytor H. McKINLEY, Jr., Defendant.

Maytor H. McKinley, Debtor.

Mitchell W. MILLER, Trustee, Plaintiff,

v.

**WILMINGTON SAVINGS FUND SOCIETY, FSB, Defendant.**

Bankruptcy No. 93–16260.
Adversary Nos. 93–0954, 96–0994.

United States Bankruptcy Court, E.D. Pennsylvania.

March 24, 1997.

Carl N. Kunz, Wilmington, DE, for Wilmington Savings Fund Society, FSB.

Joseph B. Finlay, Jr., Philadelphia, PA, Former Counsel for Debtor.

Eugene A. Camposano, Philadelphia, PA, for Trustee, Mitchell W. Miller.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

Before the court are (1) Count XXI of the adversary complaint at Adversary No. 93–0954 of Wilmington Savings Fund Society, FSB ("Wilmington Savings") requesting a finding that the debt of Maytor H. McKinley (Debtor) to Wilmington Savings is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B); (2) Debtor's counterclaim [2] seeking to recover an alleged overpayment to Wilmington Savings; and (3) Trustee's complaint against Wilmington Savings seeking turnover of excess proceeds from the bank's sale of the West Dover Business Center, an asset in which Debtor had an interest and that was liened by the bank.

To prove nondischargeability under § 523(a)(2)(B), Wilmington Savings must establish that Debtor obtained the loan by use of a materially false written statement regarding Debtor's financial condition on which Wilmington Savings reasonably relied and that Debtor made or published with intent to deceive the bank. We find that Wilmington Savings has proved all elements of nondischargeability.

### FACTS

From the evidence adduced at trial, we find the following facts. In early 1990 Debtor applied to Wilmington Savings for a commercial loan in the amount of $750,000 to finance the West Dover Business Center in Dover, Delaware. Debtor's interest in the Center was a 52 percent partnership ownership, with the rest owned by other partners, one of whom was Bernard Bruner. The development was to be an industrial complex with warehousing and storage space and a small office area. The partners hired a loan broker to look for financing. Eventually, the loan application at issue was made to and accepted by Wilmington Savings.

---

1. This Memorandum Opinion constitutes this court's findings of fact and conclusions of law. The court's jurisdiction was not at issue.

2. The parties agreed to have the case caption and litigation go forward without the typical pleading formalities because Debtor appeared *pro se.*

In conjunction with the loan application, in December, 1989, Debtor submitted to Wilmington Savings a financial statement (Exhibit 26) which reflected a net worth of $14 million. Included in the financial statement was the representation that Debtor owned 90 percent of the Oliver H. Bair Company ("Oliver Bair") stock and was owed a deferred bonus of $439,195. The deferred bonus was included under the heading "Long Term Receivables (deferred bonuses)." Exhibit 26. At trial, Debtor stated that the receivable actually was deferred bonuses and deferred rents. Debtor explained the terms of the lease by which he accrued the deferred rents.[3] Before the full, non-discounted rent rate was due, Debtor would have to demand its payment. Then, 18 months after the demand, Oliver Bair would begin to pay Debtor rent at the full lease rate, without the discount. He was never entitled to reimbursement for any of the deferred payments. The evidence established that Debtor had not demanded that the actual rent rate take effect until shortly before trial but, even if he had, Oliver Bair had no obligation to pay him the accrued differential between the full and discounted rates. Similarly, he testified that he had never demanded the deferred bonuses because he did not think Oliver Bair was in a position to pay them. Debtor denied ever having told the bank that the bonuses were readily collectible. Had they been, Debtor stated that he would have included them as current assets on the 1989 Financial Statement, and he did not do so. Instead, they were listed as "Long Term Receivables (deferred bonuses)." *See* Exhibit 26.

Wilmington Savings contends that it approved the loan in reliance upon the information contained in the financial statements submitted by Debtor. On March 14, 1990, Debtor executed a commercial loan note for $750,000 and a mortgage as security for the note in favor of Wilmington Savings. The mortgage gave Wilmington Savings a first lien on the West Dover Business Center property. The entire loan amount of $750,000 was not disbursed to Debtor; instead, $546,638.72 was disbursed immediately and, thereafter, $53,361.28 was to be paid to him on completion of construction of the office/warehouse building. The remaining $150,000 of the approved loan was to be distributed in increments of $50,000. The bank only provided the initial fund of $546,638.72 to Debtor.

Debtor continued to submit interim financial statements to Wilmington Savings that placed his net worth in the $14–16 million range through March 14, 1991, which is the date of the last financial statement signed by Debtor. However, he eventually defaulted on the note and on October 22, 1992, Wilmington Savings and Debtor entered into a settlement agreement (Exhibit 39) by which Debtor acknowledged the outstanding balance on the loan as of September 15, 1992, to be $269,968.19: *i.e.,*

| | |
|---|---|
| $244,736.00 | Principal |
| 2,872.56 | Interest (plus per diem of $67.9822) |
| 22,359.63 | Attorney's fees |
| $269,968.19 | Total |

The bank and Debtor also agreed that Wilmington Savings had received $350,000 from Bernard Bruner and applied it to the loan before the $269,968.19 balance was computed. The agreement authorized Wilmington Savings to foreclose on the mortgaged property and, if it was the highest bidder at the sale, to hold the property until it could find a third-party buyer. The parties agreed to discontinue all pending lawsuits and counterclaims. The settlement agreement specified the terms upon which the balance of the loan and any deficiency resulting from the sale of the property was to be calculated. The settlement provided that the borrowers would pay all attorneys fees and collection costs incurred by Wilmington Savings in enforcing the note and mortgage through the date of Sheriff's Sale. Wilmington Savings was permitted to seek to collect all attorney's fees and litigation costs it incurred after the Sheriff's Sale if there was a deficiency. (Exhibit 39, page 7.) Wilmington Savings foreclosed, purchased the property and later (in March, 1995) resold it to a third party for $275,000. The bank collected $257,498 from the sale.

---

3. Oliver Bair was charged a monthly rental of $5,733.33 but only had to pay $2,955.96. The difference of $2,777.37 per month was considered "deferred rents."

Before the sale occurred and on October 28, 1993, Debtor filed a chapter 11 petition and submitted financial information to the bankruptcy court stating a net worth of negative $2 million. On the date of filing, Wilmington Savings' claim was $297,704.92, consisting of principal, interest and attorney's fees. Without attorney's fees, the claim would be $275,345.29. Subsequently, an adversary proceeding was filed by Wilmington Savings on December 29, 1993, to challenge the dischargeability of the debt owed to it.

Wilmington Savings alleges that Debtor intentionally deceived it by submitting materially false or misleading financial information on which it reasonably relied when approving the loan. Debtor, however, contends that Wilmington Savings' cause of action arises from the settlement agreement and not from the original loan. We do not agree with this argument. The bank's claim arises from the original loan and defaults thereunder. The settlement agreement simply set the amount due to the bank as of September 15, 1992, and established a method by which Debtor would pay the balance owed on the original loan. The agreement also defines how the amount of the debt is to be calculated. See Memorandum Opinion and Order of February 8, 1996, denying Debtor's Motion for Summary Judgment, slip op. at 5, 1996 WL 61772.

The bank claims that after applying the proceeds of sale, it has a deficiency claim of $57,987.69 that is nondischargeable. Debtor and Trustee[4] contend that the bank actually was overpaid by approximately $30,000. Debtor and Trustee calculate Wilmington Savings' claim differently than does the bank. Rather than looking to the October 22, 1992, settlement agreement, Debtor and Trustee refer to an earlier stipulation for the entry of judgment on August 6, 1992. If this document governs, they contend, then Wilmington Savings was owed $594,398.81[5] on the date of filing. Because it received $350,000 from Bruner and $275,000 gross proceeds

from the sale, Debtor and Trustee argue that the bank received $625,000, or approximately $30,000 more than it was owed. Debtor's estate would be entitled to half of that sum and his partners would be entitled to the rest. This calculation, however, ignores per diem interest of $67.9822 for 448 days which, as of the date of filing, totaled approximately $30,456. It also ignores the fact that Wilmington Savings only received $257,498 from the sale. Thus, at best, Wilmington Savings was overpaid approximately $6,000. The stipulation for the entry of judgment also permits attorneys' fees to be added to the judgment and Debtor's calculation does not consider those fees, which would further reduce the alleged overpayment.

## ISSUES

The disputed issues are (1) if there is still an amount owing to Wilmington Savings, whether Debtor's obligation to Wilmington Savings is nondischargeable; and (2) whether Wilmington Savings has been overpaid.

■ A debt is nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code to the extent that an extension, renewal, or refinancing of credit is obtained by—

use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . .

11 U.S.C. § 523(a)(2)(B). Wilmington Savings must prove all the elements of § 523(a)(2)(B) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are to be construed strictly

---

**4.** The chapter 11 was converted to a chapter 7 liquidation proceeding in October 1994. The chapter 7 Trustee commenced Adversary No. 96–0994, alleging that Wilmington Savings was overpaid from the sale, after crediting the $350,-000 payment made by Bernard Bruner.

**5.** Debtor also challenges the calculation of interest included in the bank's claim under this method, asserting that there is $7,037.63 too much in the claim. Because we do not adopt Debtor's theory as to how the claim should be computed, we need not address this point.

against the creditor. *See In re Cohn*, 54 F.3d 1108, 1113 (3d Cir.1995).

## DISCUSSION

### Reasonable Reliance on Financial Statements

■ Wilmington Savings contends that it reasonably relied on the written financial statements, loan application and other documents Debtor submitted. Reasonable reliance is a question of fact judged by an objective standard. *In re Cohn*, 54 F.3d 1108, 1117 (3d Cir.1995). A lender must exercise that degree of care which a reasonably cautious lender would exercise in the same transaction under similar circumstances. *Id.* at 1117.

The court in *Cohn* outlined three factors for assessing reasonable reliance:

(1) the creditor's standard practice in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Id.* at 1117.

■ Wilmington Savings presented evidence at trial establishing its standard practice in determining a loan applicant's credit-worthiness. Rochelle Ann Vible, loan officer of Wilmington Savings, testified that she reviewed the financial statements and information obtained from Debtor's agents and the bank's credit analyst. She testified that she relied on all the information, but especially on Debtor's representation in the financial statement as to the availability of a receivable of $439,195 from Oliver Bair Co. Vible testified that information given to her that the $439,195 receivable was highly liquid materially influenced the decision to approve Debtor's loan application. However, she admitted that she never personally discussed the financial statements with Debtor. She spoke only to other bank staff members, although Debtor, his staff and his loan broker all provided documents and other oral and written information to the bank.

Vible testified that all information she utilized was given to her by her supervisor, Mr. Mawhinney, and his staff. In addition, Ms. Vible explained how other bank staff contacted Debtor and his agents and received information from them, which they then passed to her for review. She relied upon information provided to her by the credit analysts who had consulted other banks about Debtor's financial history. Following the bank's procedures, she reviewed the loan application and supporting documents, filled in missing information through various contacts, prepared a loan summary and presented it to the bank's loan committee. In recommending approval of the loan, she was most influenced by the fact that the receivable from Oliver Bair was readily collectible, and that payment had been deferred only for tax reasons. Her loan writeup concluded that liquid assets, net of liabilities, available as collateral were valued at $116,000 plus the highly liquid receivable of $439,195.

We find that Wilmington Savings acted in accordance with its procedures. There was no testimony about industry standards for approving loans similar to Debtor's but the bank's conduct was reasonable under the circumstances. Wilmington Savings took several steps to verify Debtor's financial status and its efforts did not reveal the inaccuracy of his written financial statement.

Wilmington Savings did not produce a witness who spoke to Debtor about the receivable. Debtor denies that he ever stated that the receivable was highly liquid or readily collectible and the financial statement clearly marks the entry as a long term receivable. The bank's loan writeup (Exhibit 37) states at page 35:

Included on McKinley's balance sheet is a $439M long term receivable from The Oliver H. Bair Company, McKinley's funeral home in Philadelphia. This receivable represents income from the partnership which Mr. McKinley has deferred for tax purposes. It has been excluded from the outside net worth calculation, but according to Mr. McKinley it is a highly liquid receivable which can be collected at any time. Written confirmation of this receivable has been requested.

The fair inference from the bank's evidence and the course of conduct of the parties is that Debtor, or an agent of his, assured the bank of the receivables' collectibility. The bank's loan writeup is an extensive analysis of the bank's potential exposure on the loan, the financial resources of each of the partners, and the availability of liquid assets that could be used to pay down the loan. It indicates that Wilmington Savings entered into this transaction because of Debtor's strong credit, the ideal location of the property, the strong market for the property, the "deep pockets" of the joint makers, the "substantial financial resources and liquidity [of Debtor] as evidenced by his personal lines of credit and the Oliver Bair receivable," and the "opportunity to gain a customer with substantial net worth" whose "business ventures may become a good source of future business opportunities for WSFS." Exhibit 37, page 38. *See also* page 33 of Exhibit 37 wherein the Bank explained

> Since the project itself may not fully support the debt, Mr. McKinley's strong credit becomes a major factor in determining the strength of this loan. Mr. McKinley's desire and ability to support the project financially has already been demonstrated by his full funding of the development to date.

> A strong source of account, if needed, is Mr. McKinley's $439,195 deferred bonus from The Oliver H. Bair Co. Although these bonuses have been deferred for tax reasons, they are available to Mr. McKinley at a moment's notice and are viewed as a strong source of liquid assets if needed.

The evidence establishes that Wilmington Savings reasonably relied on the financial statement of Debtor.

## INTENT OF DEBTOR TO DECEIVE THE BANK

■ Debtor admits that the financial statement was published to Wilmington Savings for the purpose of obtaining the loan. At the time, it was materially false in that the $439,195 was not just "deferred bonuses" but also included "deferred rent" that would never be repaid by Oliver Bair under the terms of the lease. Debtor called a member of the Board of Directors and CFO of Oliver Bair, Albert M. Corrato, Jr., who testified that the company did owe deferred bonuses, although the specific amount owed to Debtor was not known to him. Corrato stated that Oliver Bair could not pay the deferred bonus in a lump sum and that it was not a readily collectible receivable. He also acknowledged that Debtor had recently demanded full rental payments and agreed that the rent deferral would never result in a cash payment. Under the circumstances we find that Debtor knew at the time he published his financial statement to the bank that it was materially false in that the amount allegedly due from Oliver Bair would never be collected. We further find that Debtor published the falsity with the intent to deceive the bank.

Because the ability to collect against liquid assets was a material concern to the bank and because, without the $439,195, Debtor had only $116,000 in liquid assets to support a debt of $750,000, we find the financial statement to be materially false and misleading. The bank reasonably relied upon it. Therefore, we find that Wilmington Savings met its burden of proving all elements of § 523(a)(2)(B). The debt is non-dischargeable, if any remains unpaid.

## OVERPAYMENT OF DEBT

■ Debtor and Trustee argue that Wilmington Savings has been overpaid on the debt. In October, 1992, Debtor entered a settlement agreement with Wilmington Savings establishing the delinquency and terms of calculating the debt for repayment. We credit Wilmington Savings' evidence comput-

ing the debt. The bank established that its claim was based upon the figures in the settlement agreement plus additional accrued interest and attorneys' fees from October 22, 1992, to the date of filing.

Wilmington Savings presented evidence establishing that it did not receive an overpayment. After crediting the $350,000 from Bruner, its claim on the date of filing was $297,704.92. It received $257,498 from the sale, leaving a deficiency of $40,303 as of the filing date and $57,987.69 as of the March 31, 1995, sale date. The October 22, 1992, settlement agreement defines deficiency as "the sum due WSFS on the Outstanding Balance after payment to WSFS of ... (b) the proceeds from the [sale to a third party.]" As of the sale date, Wilmington Savings was owed and unpaid $57,987.69. Therefore, based on the evidence presented, we find that Wilmington Savings has not received an overpayment on the outstanding debt.

■ The settlement agreement specifies that, after the resale, attorneys' fees and collection and/or litigation costs will not be automatically added to the debt. The bank is permitted to seek them, however. In this case, none will be allowed. The bank had possession of the property for many months before the sale and controlled the timing and price of the resale. Section 506(b) provides that an oversecured creditor may receive "reasonable fees, costs, or charges" if the agreement under which the claim arose provides for same. The settlement agreement in this case states that Wilmington Savings Fund Society "may seek" fees. Fees are not required under the agreement. Because we find that the circumstances are not so egregious as to militate in favor of an award of fees to Wilmington Savings Fund Society, we will deny its fee request. Further, the bank is not oversecured.

■ There is also the question of post-sale interest. Generally, unmatured interest does not accrue postpetition unless the debt is nondischargeable. *See generally, Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). *See also, Leeper v. Pa. Higher Education Assistance Agency (PHEAA),* 49 F.3d 98 (3d Cir.1995) (interest accrues postpetition on nondischargeable

debts against debtor, not the estate). *Cf., United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (the general rule under § 506(b) is undersecured creditors do not receive postpetition interest on a prepetition claim).

■ However, because Debtor's underlying obligation is nondischargeable, interest continues to accrue postpetition against Debtor, not the estate. *Cf., Leeper v. Pa. Higher Education Assistance Agency (PHEAA),* 49 F.3d 98 (3d Cir.1995) (discussing the accrual of postpetition interest on nondischargeable debts in a Chapter 13 and concluding that the accrual applies in other chapters as well). *See also Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). Debtor remains personally liable for postpetition interest. Therefore, judgment will be entered for the balance owed plus interest at 5 percent (the applicable Delaware rate) in favor of Wilmington Savings Fund Society and against Debtor on the complaint at Adversary 93–0954. The counterclaim at Adversary No. 93–0954 will be dismissed. Judgment will be entered in favor of Wilmington Savings and against Trustee at Adversary No. 96–0994.

Appropriate Orders will be entered.

### JUDGMENT ORDER

AND NOW, to-wit, this **24th** day of **March, 1997,** for the reasons set forth in the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED AND DECREED** that

(1) The deficiency of $57,987.69 together with interest at 5 percent from and after April 1, 1995, owed by Debtor to Plaintiff Wilmington Savings Fund Society, FSB, is **NONDISCHARGEABLE;**

(2) Judgment is entered in favor of Plaintiff, Wilmington Savings Fund Society, FSB, and against Defendant, Maytor H. McKinley, Jr., on the complaint in the amount of $57,-987.69, plus interest at 5 percent from April 1, 1995;

(3) Judgment is entered in favor of Third–Party Defendant Wilmington Savings Fund

Society, FSB, and against Third Party Plaintiff Maytor H. McKinley, Jr., on the counterclaim and the counterclaim is dismissed with prejudice.

It is **FURTHER ORDERED** that the Clerk shall close this adversary.

### *JUDGMENT ORDER*

**AND NOW,** to-wit, this **24th** day of **March, 1997,** for the reasons set forth in the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of Defendant Wilmington Savings Fund Society, FSB, and against Plaintiff Trustee, Mitchell W. Miller.

It is **FURTHER ORDERED** that the Complaint is dismissed with prejudice.

It is **FURTHER ORDERED** that the Clerk shall close this adversary.